Ejectment; not guilty, and issue. — The defendants claimed under the youngest grant, and relied on the statute of limitations. It was proved on the part of the defendant that Thomas Molloy purchased at sheriff's sale, and took a sheriff's deed; he sold to Shannon, and gave his bond to convey. Shannon took possession early in the spring of 1800, and made a lettuce and cabbage patch about twenty poles within the tract of the plaintiff; cleared a small quantity adjoining, perhaps a quarter of an acre, which in the following fall he added to, and continued to add to the clearing. On the 22d of August, 1800, Molloy conveyed to Shannon, and on the 15th of August, 1807, the declaration in ejectment is indorsed as having issued, and came to the hands of the marshal, on the 26th of August, 1807. The defendants showed a copy of a grant to John Eaton; a judgment on a sci. fa. against the heirs of Pinkham Eaton, naming four persons among whom was John Eaton. The land was sold, and a sheriff's deed made to Molloy, as above.
For the plaintiff, the following grounds were taken: —
1st. The defendant must show a regular and connected chain of legal title from the grantee; otherwise, the statute cannot apply.
2d. A connected title has not been shown. The judgment is against four of the Batons, stating them heirs of Pinkham Eaton, deceased; the grant, part of which was sold by the sheriff, is to John Eaton, administrator of Pinkham Eaton, deceased. The judgment was obtained upon two nihils, which is not legal in a case where heirs are to be affected. There *Page 466 
should have been a scire feci returned. The judgment is invalid, but if good, the sheriff had no right to sell the land of John Eaton, for the grant does not state that John Eaton took as heir, and we cannot presume it; the sheriff had no more right to sell the land of John Eaton, under this judgment, than of any individual in society, — the sale was therefore void, and no right vested under it in Molloy; he therefore had not any to convey to Shannon. The statute was intended to protect possessors, under a regular chain of legal title, against an older regular title. It could not give a title unless there was one before, and where there is a defective title it is as none.
We are inclined to think the statute applies; some doubt however exists on two grounds, — whether it be necessary for the defendant to show a good legal title by valid conveyances from the grant. The point however upon which we doubt at present, is, that the sheriff in his return on the execution does not state the particular tract out of which he sold; but, at present, the jury may consider the statute of limitations as applying to the case, as it is believed the plaintiff was not competent to make objections on account of errors in the judgment.
The jury, after some time, found a verdict for the plaintiff, and, upon a rule for a new trial, it was argued by OVERTON and HAYWOOD, for the defendants, upon the following grounds: —
1st. The grant to John Eaton is good, and passes the estate to him as heir of Pinkham Eaton, deceased.
2d. If the judgment against Eaton's heirs is erroneous the plaintiff, being a stranger, not party nor privy in blood nor estate, cannot take advantage of it.
3d. If the judgment is erroneous the sale is good.
4th. But it is not even erroneous.
5th. The statute of limitations protects irregular conveyances, and even where there is no regular chain of conveyances, provided the possessor claims under a deed bonâ fide. *Page 467 
As to the first point, it was said that mistakes in grants could not destroy their validity;[1] the intention of the party granting must be collected as in construing other instruments. The grant recites the number of the warrant and entry, both of which are in the name of Pinkham Eaton, and the grant, though it states John Eaton administrator, manifestly designed that he should take as heir; in fact, he was obliged to take in that capacity, as the law would not allow of his taking in any other.[1]
On the second ground, the judgment having been rendered by a court of competent jurisdiction, must stand until reversed by parties or privies.[2]
As to the third point, we lay it down as certain, that this land having been granted in right of representation of the deceased, was liable to sale for his debts. The twenty-third section of the Court Law, 1794, c. 1, rendered lands, tenements, and hereditaments liable to execution. Upon a similar clause in Ird. Rev. November, 1777, c. 2, it was determined by M'Nairy, J., previous to the Act of 1793, c. 5, § 7, that an entry could be sold under execution.[3] The act giving bounty lands to the officers and soldiers, in case of the death of the officer or soldier, gives it expressly to the heirs. 1782, c. 3, § 6.
It is said Pinkham Eaton died in the year 1781, and that this land vests in the heir by purchase, and is not liable to the debts of the deceased. This we by no means admit; but, supposing it did, if the heir or heirs were satisfied that it should be liable, it does not lie in the mouth of the plaintiff, who is a stranger, *Page 468 
to say that it shall not. The sale is good, though the judgment may be erroneous or irregular.[4]
But it were not even necessary to name the persons who are heirs.[5]
They might have been named as heirs generally. A sci. fa. is not subject to the same strictness as an original suit.[6]
4th. But this judgment is not erroneous. John Eaton, to whom the grant issued, is one of the persons named as heir, and though others might have been joined who had no interest in the land, the judgment is good against John Eaton. He could only take advantage of more persons being joined than ought to have been by plea in abatement.[7] Neither of the other defendants can reverse the judgment as to this land, for two reasons, — want of interest, 2 Bac. Ab. tit. Error B., ib. tit. Execution, P.; and having had a day in court. Anciently, irregularities in executions were classed under the title "Error;"[8] but, of late years, such errors are rectified on motion.[9] But in no case where a judgment shall have been reversed shall the party be restored to property sold on a fi. fa., which will be perceived by recurrence to the authorities last mentioned, and the cases referred to in Haywood's Reports, in the third division of this argument, except indeed it be in a case where the party obtaining the judgment purchases under the execution. Lands are sold here by fi. fa., and the same principles are attributable to proceedings under it respecting land that would be respecting personal property.[1] An objection has been taken to the return of the sheriff in not describing the land sold; to this it is answered, that the sale would have been good if the execution had never been returned. A fortiori, where the return is merely informal, and can do no injury.[2]
Though we have been thus minute in removing objections, to supposed errors in obtaining the *Page 469 
judgment and issuing the grant, it was not thought absolutely necessary. One plain and decisive answer to the plaintiff is at hand for all these objections. You are a stranger to them, and as you cannot be injured by these transactions of others, res inter alias acta non nocet, so you shall not derive any benefit from them agreeably to a maxim of the civil law, alii per alium non acquiritur exceptio.
A judgment of a competent tribunal, and all the proceedings under it, stand good, and must be taken as true until reversed. Whether John Eaton be heir or not is immaterial with you; the title would be in some person with whom you would have to contend. The State have said in the grant, that he takes as heir, and as such the judgment is against him, and this must be taken as true whenever it comes collaterally before the Court.[3] Eaton makes no complaint that these lands have been sold for his brother's debts, the plaintiff has no right to complain.
5th. Whether the judgment or conveyances be regular or not, the statute of limitations covers the defendant's case.
The Act of 1715 confirms claims under executors, administrators, heirs; and wives. Now it is clear that these persons had no more right to sell lands than one person would have to sell the land of another; yet validity is expressly given to them by the act when attended by the seven years' possession. For many years in North Carolina; the bench and bar were divided in their construction of the act of limitations. Some thought and a very respectable portion of the bench and bar were of that opinion, that possession alone for seven years without any title, or color of title, would give a right, and bar others;[4] the question was at length settled by the Court of Conference, that there should be a color of title to enable a person to hold by seven years' possession.[5] But no person ever supposed or contended that a perfect legality of connected title was required.[6] The subject respecting seven years' possession was contested here in the same manner it was in North Carolina, and the difference of opinion was the reason of the passage of the Act of 1797, c. 43, § 4. *Page 470 
It was the only design of the act to make color of title necessary. The section, transposed into plain language, will read thus: "Where any person shall have had possession of land for seven years, such possession being in consequence of a grant, or deed founded on a grant, without claim by suit in law; that then all persons shall be barred." This act is professedly an explanation of the Act of 1715, its object was not to introduce any new provision, it was only to remove a doubt whether a naked possession for seven years would give a right or not; to carry the act any further would be going beyond its express words, which was to remove the doubt then existing. Before the passage of the Act of 1797 no person ever doubted that possession would require any thing more than a color of title bonâ fide; as a deed from some person honestly made, the land having been granted by the State.
The expression in the Act of 1797, which has created the doubt, is "founded on a grant," from which it is implied, according to the argument on the other side, that there must be a regular connection with the grant; if one link is broken it cannot be said to be "founded on a grant." The Act of 1715 speaks of titles "derived under sales from executors," c. In this case we know there is not any regular legal chain of title, and it surely was not the intention of the Act of 1797 to repeal the Act of 1715, as to irregular and imperfect conveyances by executors and others. The principles contended for on the other side would repeal the most beneficial part of the Act of 1715, instead of explaining it, as the legislature profess to do. The expressions seem to be of the same import as those in the Act of 1797; we ought not therefore to extend their meaning beyond the object the legislature had in view. The intention of the legislature manifestly was, that no seven years' possession should be available unless the possessor had a deed, and that the land so possessed should be granted; or, in other words, that the possession should have its foundation or derivation in a grant from the State. The possession by deed must be bottomed or founded on a grant to make it available. *Page 471 
Giving the Act of 1797 this construction, which it will bear, avoids the absurdity of enacting a new law, which the legislature from their own unequivocal language, never designed. To give it any other construction would nearly annihilate the highly beneficial provisions of the statute, which was to cure defects in titles, by protecting after a certain lapse of time the honest improver and cultivator of the earth.[1]
There is no doubt but that the defendant Shannon and Molloy, under whom he claims, had been in possession upwards of seven years. From April, 1800, until the 22d of August following, when Shannon got his deed, it was in the possession of Molloy, Shannon having been placed on the land by him.[1]
The suing out of the declaration in this case ought to be considered on the 26th of August, 1807, when it came to the hands of the marshal; and this would be steering clear of the objection that Shannon had no deed to cover his seven years' possession. Computing from this day, he had a deed the whole time, and four days to spare. There is no telling that this declaration issued at the time it is marked on the back; the attorney might have antedated, to prevent the running of the statute, and if he had written it he might not have given it to the marshal. It was the same thing as if it had not been written at all. Unless, then, it could be proved that it had been issued before, we must take the time of its coming to the hands of the marshal as the true time.[2]
It is not however wished to be understood that we have no other defence than the statute of limitations. We have an older entry than their grant, which, according to the practice of the State, we could rely on. The entry was read and compared with the plat. Our entry has been surveyed agreeably to its calls. November, 1777, c. 1, §§ 5, 10; 1779, c. 6, § 6; 1783, c. 2, § 19; 1786, c. 20, § 1.
The beginning of the entry is special, and in running down toward Harpeth, the surveyor was obliged to stop at Moore's tract, which was an older one. The land being taken upon the west, the surveyor could run it no other way than he did. A surveyor, in surveying, acts independent of the claimant, and if he did not construe the entry in the equitable *Page 472 
manner now contended for, is that to operate to the injury of Eaton, or those claiming under him? Much was said in the case of Polk's Lessee v. Robertson and Cockrel, and many cases cited from Haywood's Reports, to show that the mistake of a surveyor shall not prejudice a grantee.[3] Why should the surveyor's mistaken construction of an entry prejudice the enterer or claimant? It would be highly unjust that the act of the surveyor should operate to the prejudice of the enterer, unless in cases where he surveyed contrary to the plain words of an entry. Not a meaning by what is called an equitable construction; as where the inclusion of a particular object is called for, that you must put it in the centre, or where an entry calls to lie on a watercourse, it must be on both sides, or equally on both sides. In the first case, as common men and surveyors have and will always understand such entries, there would be a compliance with it if the object should be included in any part of the survey; and, in the second, if the land surveyed should lie on the creek, though on one side and bounded by it.[1]
As the oldest entry was to be first surveyed, having by all our acts a preference in being surveyed and granted, precise certainty was not necessary in an entry, and none of the statutes require it. Agreeably to our law and its practice, an entry may be more or less certain. We have understood it to be the design of the first to confine the surveyor in making the survey to precise limits, the enterer choosing a particular spot as calling for course and distance. In the other, the surveyor surveys as he thinks proper, according to the plain calls of the entry; and if he conforms to the calls according to common understanding, being the oldest entry, and having the preference in survey and grant, by law it must hold. But where certain courses and distances are called for in an entry, if different courses or distances are taken by the surveyor, this is what we call surveying contrary to an entry, and a subsequent claimant without notice, upon the principles of equity, is not to be affected. We have conformed to these principles, and therefore, without the aid of the statute of limitations, we have the right to hold. *Page 473 
DICKINSON and CAMPBELL, in conclusion, said they did not mean to contest the regularity of the judgment. It was the Act of 1797 that must be relied upon. The legislature were competent to make what alterations in the Act of 1715 they thought proper.
Their meaning in the Act of 1797 is very plain; when they require a deed of conveyance founded on a grant it must necessarily be connected with it by regular conveyances; if it is not, it cannot be founded on a grant.
[1] See 2 Bay, 539; 2 Binn. 109; 3 Call, 242.
[1] Bac. Ab. ed. 1807, tit. Grant, I. 393; H. 3, 392; H. 2, 391, c. 399, n., 378, 381; H. 1, 388; 1 Hayw. 238, 239, 254, 377, 496; 2 Hay. 139, 148, 160, 179, 183, 354, 384, 301, 347, 348, 350; Acts Tenn. 1796, c. 20.
[2] 5 Com. Dig. tit. Pleader; 3 B. 7; 3 B. 9. See also 4 Mass. 612; Hardin, 291; 2 Caines' C. E. 255, 259; Swift's L. E.
[3] Frazier v. Haw, at Nashville, in the State District Court.
[4] 2 Tidd's Pr. 936; Com. Dig. tit. Execution, C. 6; 2 Hay. 79, 80; 1 Hay. 95, 71, 65, 66, 62, 63. See 2 Binn. 223; 1 Binn. 40; 2 Bay, 329; 4 Dall. 220; 1 Wash. 313.
[5] 2 Salk. 600; Ld. Ray. 669.
[6] Latch, 112.
[7] 1 Com. Dig. tit. Abatement, F. 12, 13, 14, 15.
[8] 5 Com. Dig. tit. Pleader; 3 B. 1.
[9] 2 Tidd's Pr. 935.
[1] See 1 Wash. 313.
[2] 6 Com. Dig. tit. Return, F. 1; 4 Com. Dig. tit. Execution, C. 7. See 1 Dall. 63, 93.
[3] Amb. 761.
[4] 1 Hay. 11; 2 Hay. 88, 223.
[5] 2 Hay. 336.
[6] 2 Hay. 69; Napier's Lessee v. Simpson, Clarksville, June, 1809.
[1] Cowp. 217; 1 Burr. 119; 1 Hay. 319; 2 Hay. 11, 59, 69, 114, 345. See 4 Mass. 188; 2 Bay, 160; 1 Binn. 212.
[1] 2 Bac. Ab. 423, tit. Ejectment, D. 3; 6 Com. Dig. tit. Trespass, B. 12; 2 Str. 1128; 2 Hay. 11, 345; 2 Caines' C. E. 301; 4 Johns. 230.
[2] 2 Burr. 958.
[3] 4 Dall. 210, 218; 3 Binn. 30, 32.
[1] Hoggat v. M'Crory, Kerr's Lessee v. Porter, and Kendrick et als. v. Dallum, S. C. E. A.