The opinion formerly delivered in this cause remains the same. It will therefore be useless to reiterate the reasons for this opinion. It may be seen and examined by any person desirous of looking into it, being now on file in court. That there may be no misunderstanding, its result will be stated.
Having been in the practice of the law here since the spring of 1789, he was enabled to acquire a knowledge of the opinions of the bar and bench. respecting the construction put on the statute of 1715. In the fall and winter of 1789, being then a member of the convention which sat at Fayetteville in *Page 385 
that year, no pains was spared to acquire a knowledge of the decisions of the courts, and habits of legal thinking in relation to this statute, as well as of the land laws of North Carolina generally. At that time, among the best informed lawyers, as well as with the judges, Williams and Ashe, with whom he conversed, there seemed to be but one opinion, viz., that when a man had been seven years in peaceable possession, claiming the land as his own during the whole of the time, it was a complete bar against all the world; and he was not obliged on his part to introduce any other evidence than his possession, accompanied with the reputation of claiming as above. Since his first settlement in this country, business had at several different times made it necessary not only to go to the seat of government of North Carolina, but a continued intercourse had been kept up with several lawyers of reputation residing there, and who have had practice in the investigation of land titles. Under these circumstances, it will not appear surprising that the rise, progress, and termination of the dispute respecting color of paper title (which began in North Carolina in 1795 or 1796, and ended in 1804) should have been carefully observed.
The opinions and arguments of Mr. Haywood, however highly reputable as a lawyer and as a judge, never were satisfactory on that ground, so far as they tended to remove the legal presumption of right attached to seven years' possession, and requiring color of title to be shown by the defendant, which seemed to be their main object.
The passage of our Act of 1797 introduced an important principle into the doctrine of limitation. Previously to the year 1795, presumption of right always accompanied the seven years' peaceable possession by a person claiming property. Under such circumstances the presumption was conclusive. The Act of 1797 makes it necessary that thepossessor, before he can avail himself of the limitation act, should show some color of paper title, by some valid, legal,
paper writing, such as a grant, deed, will, c, either to himself or some person under whose title he claims the possession.
The legislature thereby intended to establish a criterion by which to ascertain that the possessor claimed originally rightfully, and not by wrong, or as a trespasser. It is conceived that it was not the intention of the legislature in the passage of the Act of 1797 to require aregular or irregular deraignment of title from the grantee of the State, and therefore, as expressed in the opinion on file, that this judgment *Page 386 
ought to be reversed. But as a majority of the Court seem to be of opinion that the defendants have not shown sufficient evidence of title, the judgment will probably stand affirmed.
The judgment was affirmed.[1]
COOKE and ROANE, JJ., tacite.[2]
NOTE. — "The construction of that act (1797), says a distinguished contemporary of the scenes he depicts, engendered a controversy in Tennessee, from the excitement of which, at one period, very few persons of any consideration in society were entirely exempt. That controversy continued, and raged with increasing intensity and bitterness, for a space of about twenty-five years; during the different vicissitudes and doubtful issues of which, it agitated our legislative councils and judicial tribunals to an extent that was both unexampled and alarming." Thos. Washington, Esq., in his argument before the Supreme Court of the United States, in 1839, in the case of Scott and others v. Reid and others.
In this argument, Mr. W. gives a very graphic sketch of the conflict, and the principal actors in it. It commenced with the case of Hampton's Lessee v. McGinnis, 1 Tenn. 286, decided in 1808, but instituted several years previous, and terminated with Gray v.
Darby's Lessee, M. Y. 396, decided in 1825. The leading cases are, Sawyer's Lessee v. Shannon, 1 Tenn. 465; Lillard v.
Elliott, decided in 1815, and often referred to, but not reported; Weatherhead and Douglas v. Bledsoe's Heirs, 2 Tenn. 352; Pattonv. Eastin, 1 Wheat. 276; Powell's Lessee v. Green, 2 Pet. 240; Harris v. Bledsoe, Peck, 234; Darby's Lesseev. McCarroll, 5 Hay. 286; Barton's Lessee v. Shall, Peck, 215; Waterhouse v. Martin, Peck, 374; Gray v.
Darby, M. T. 396; Green v. Neale, 6 Pet. 291. During this period, and up to 1815, the dogma, as Mr. Meigs calls it, of mere color of title, seems rather to haye prevailed; afterwards, for several years, the doctrine of connected chain of title was understood to be the law, and was recognized by the Supreme Court of the United States in 1 Wheat. 276, and 2 Pet. 240. The knot was at length emphatically cut by the Court holding, in Gray v. Darby, that a deed, with seven years' possession, though void, and having no connection, eitherlegal or equitable, with the grant, is a bar. And to this ruling the Supreme Court of the United States conformed in 6 Pet. 291.
To establish a new rule for the limitation of actions for the recovery of land, which should be plain and intelligible, and to do away entirely with "color of title," "equitable connections," "apparent equities," et id omne irritabile genus, the Act of 1819, 28, was passed (Code, 2763-2766), and has proved a genuine "statute of repose." — ED.
[1] Quære. Should not this case have been remanded or remained suspended, in statu quo, as no two of the judges agreed on the main ground? Overton and Cooke, JJ., agreed that it wasmatter of law for the court to judge of, whether the bar of the statute was sufficient; one believing that the bar was sufficient, the other that it was not.
According to Judge Roane's opinion, being matter of fact to be left to a jury, it might seem from thence that the judgment of the Circuit Court ought, according to that opinion, to have been reversed, and the cause remanded for another trial. It is however probable, that neither Cooke nor Overton, JJ., would have accorded in remanding the cause.
[2] A similar question occurred in the Supreme Court of the United States at February term, 1816, in the case of Patton's Lesseev. Eastin. The following is the opinion of that court: —
"This was an ejectment instituted in the Circuit Court for the western district of Tennessee, for one moiety of a lot of ground lying in the town of Nashville.
"The legislature of North Carolina, while Tennessee was a part of that State, passed an act establishing the town of Nashville, and investing 200 acres of land in trust to be laid off in lots, and sold and conveyed in the manner prescribed in the act.
"On the first of July, 1784, subsequently to the passage of the act establishing the town, the trustees executed a deed regularly conveying the lot, for a moiety of which this suit is brought, to Obednigo Llewellin. On the first of April, 1810, Shadrack Llewellin, heir-at-law of Obednigo, who had then attained his full age of twenty-one years, for seven years and upwards, executed a deed conveying the land in controversy to Francis May, after which, and previous to the institution of this suit, Francis May conveyed the same land to the lessor of the plaintiff.
"The defendant produced a deed, dated the second day of February in the year 1793, executed by a certain Josiah Love, and purporting to convey the land in controversy to William T. Lewis.
"It appeared in evidence that Lewis had purchased the ground fairly, had paid a valuable consideration for it, and that, at the time, no person was in possession of it. Immediately after the conveyance, Lewis entered into and took full possession of the premises, made valuable improvements thereon, and continued so possessed until the of February, 1810, when he sold and conveyed the same to William Eastin, the defendant, who entered into, and took possession, and continued peaceably possessed thereof, until the twelfth day of November, 1810, when this suit was instituted.
"Upon this testimony, the counsel for the defendant moved the Court to instruct the jury that the defendant was protected in his possession of the premises by the laws of the land, and that by virtue of the said laws the plaintiff was barred from recovering the said parcel of ground and premises.
"On this question the judges were divided, which question and division have been certified to this court as prescribed by law.
"The evidence is not so stated on the record as to present any point for the consideration of this court, other than the question, whether the possession of seven years is in this case a bar to the plaintiff's action.
"This question depends on the construction of an act of the legislature passed in the year 1797, to explain an act of the legislature of North Carolina passed in the year 1715.
"The Act of 1715, affirming in the first and second sections certain irregular deeds previously made, under which possession had been held for seven years, enacts in the third section `that no person or persons, nor their heirs, which hereafter shall have any right or title to any lands, tenements, or hereditaments, shall thereunto enter or make claim, but within seven years next after his, her, or their right or title, which descend or accrue: and in default thereof, such person or persons, so not entering or making default, shall be utterly excluded and disabled from any entry or claim thereafter to be made.'
"The fourth contains the usual saving in favor of infants, c., who are authorized, within three years after their disabilities shall cease, to commence his or her suit, or make his or her entry.
"Persons beyond sea allowed eight years after their return; `but that all possessions held without suing such claim as aforesaid shall be a perpetual bar against all and all manner of persons whatsoever, that the expectation of heirs may not, in a short time, leave much lands unpossessed and titles so perplexed that no man will know from whom to take or buy land.'
"The Court and lawyers of the State of North Carolina had been much divided on the construction of this act. Some maintained that, like other acts of limitation, it protects a mere naked possession; others that the first and second sections, which axe retrospective, have such an influence on the third and fourth, which are prospective, as to limit their operation to a possession acquired and held by color of title.
This court is relieved from an investigation of these doubts by a case decided in the Supreme Court of North Carolina, in which it was finally determined that the act of 1715 afforded protection to those only who held by color of title.
"This contest was maintained as strenuously in Tennessee after its separation from North Carolina, as in the parent State.
"Anterior to the decision of the Superior Court in North Carolina, which has been mentioned, the legislature passed an act to settle the true construction of the existing laws, respecting seven years' peaceable possession, in which it is enacted, `that in all cases where any person or persons shall have had seven years' peaceable possession of any land, by virtue of a grant or deed of conveyance founded upona grant, and no legal claim by suit in law by such set up to said land within the above said term, that then and in that case the person or persons so holding possession as aforesaid shall be entitled to hold possession, in preference to all other claimants, such quantity of land as shall be specified in his, her, or their said grant, deed of conveyance, founded on a grant as aforesaid.'
"The act then proceeds to bar the claim of those who shall neglect for the term of seven years to avail themselves of any title they may have.
"As it not unfrequently happens, this explanatory law generated as many doubts as the law it was intended to explain.
"On the one part it was contended that, being designed for the sole purpose of removing `all uncertainty respecting the construction of the Act of 1715, its provisions ought to be limited to its avowed object, and, as a doubt had never existed whether it was necessary for a person in possession to show more than a color of title, a deed acquired in good faith, in order to protect himself under that act; so nothing further ought to be required in order to enable him to avail himself of the Act of 1797. That if it should be necessary to have a title up to a grant, the Act of 1797, instead of quieting possessions, would in process of time strip a very long possession of that protecting quality which the policy of all other countries bestowed upon it. That the Act of 1797 was obviously drawn with so much carelessness as in some of its parts to exclude the possibility of a literal construction; and for this reason a more liberal construction would be admissible in order to effect its intent. It was therefore insisted not to be necessary for the defendant, holding possession under a bond fide conveyance of lands which had been actually granted, to deduce his title from the grant, but that it was sufficient to show that the land had been granted and that he had held a peaceable possession of seven years under a deed.
"On the other part it was contended that on this point there is no ambiguity in the words of the act. The seven years' possession, to be available, must be `by virtue of a grant or of a deed founded on a grant.' It is as essential that the deed should be founded on a grant, as that a deed should exist. A possession of seven years does no more in the one case than in the other, — bar a legal title. The words of the act being perfectly clear, they must be understood in their natural sense. When confined to different deeds founded on the same patent, or to deeds founded on different patents for the same land, although some cases of fair possessions may be excluded from their operation, yet they will apply to the great mass of cases arising in the country.
"This question too has at length been settled in the Supreme Court of the State, subsequent to the division of opinion on this question in the Circuit Court.
"Two cases have been decided in the Supreme Court for the State of Tennessee, which have settled the construction of the Act of 1797. It has been decided that a possession of seven years is a bar only when held `under a grant or deed founded on a grant;' the deed must be connected with the grant.
"This court concurs in this opinion. A deed cannot be founded on a grant which gives a title not derived in law or equity from the grant, and the words `founded on a grant' are too important to be discarded.
"The Act of Assembly vesting lands in the trustees of the town of Nashville, is a grant of those lands, and as the defendant shows no title under them, nor under any other grant, his possession of seven years cannot protect his title, nor bar that of the plaintiff."
This case was argued before the Supreme Court of the United States at February term, 1815, and continued on advisement, as it has been understood. In the latter end of the subsequent term the above opinion was delivered. From the time employed in argument, and on advisement, it is not improbable some difficulties were experienced in the examination; and that these difficulties were removed by the decisions which had taken place in North Carolina and this State, which are referred to in the opinion. Judge "Washington, in the case of Golden v.
Prince, in the Circuit Court of Pennsylvania, N. C. Law Rep. 431, observes "that the injustice, as well as the absurdity of the Federal Court deciding by one rule, and the State Court by another, would be too monstrous to find a place in any system of government; "and again, in the case of Martin v. Fairfax, February term of the S. C. U. S. 1816, Judge Johnson remarks "that there is one claim which we can with confidence assert in our own name, upon the State tribunals: the profound, uniform, and unaffected respect which this court has always exhibited for State decisions give us"(S. C. U. S.) "strong pretensions to judicial comity."
It cannot be considered indecorous to examine the extent and force of these decisions, on which the S. C. U. S. seems to rest its opinion. It may be, that the argument before the Supreme Court did not disclose the whole ground on which these decisions rested; certain it is that the arguments and decisions in the Supreme Court, in this State, did not; and it is the more necessary to shed any additional light on the subject, as, in a matter of such extensive consequence to society, it is not improbable that the legislature may think proper to act in the affair, and thus, by a plain and unambiguous act, put an end to all doubts and difficulties. To use the language of the S. C. U. S., "this explanatory act generated as many doubts as the law it was intended to explain. "In a matter of so much consequence to the people, it may perhaps be found necessary to make another attempt at explanation, or in the form of amendment, or repeal, to place the law on a lasting foundation.
The Supreme Court of the United States considers the construction of the Act of 1715 as settled by a decision of the Supreme Court of North Carolina. This may be correct in relation to the course pursued by that court, whilst it must be admitted on all hands that the judges of the Supreme Court of the State of Tennessee could not have justified themselves to their country or to their own consciences, when examining the explanatory Act of 1797, in taking, as data, the correctness of decisions of any other State. Whilst this country was a part of North Carolina, its inferior tribunals would be bound by the decisions of the Supreme Court of that State. The decision in North Carolina, referred to by the Supreme Court of the United States, did not take place until the year 1804, more than fourteen years after the separation of this country from North Carolina. Hence the necessity of an examination into the correctness of that decision by the Supreme Court of this State.
The circumstances attending the two decisions of the Supreme Court of this State, spoken of by the S. C. U. S. as settling the construction of the Act of 1797, deserve particular consideration.
In the year 1808, the case of Hampton v. M'Ginnis took place, and though but one judge out of three intimated an opinion, it produced public discussion. In November of the same year, the case of Cradock's Lessee v. Stalcup occurred, when the sense of the whole Court sanctioned the idea that a connected chain of title was not requisite. The case of Napier's Lessee v. Simpson, in June, 1809, is to the same effect.
In the two first cases, the question did not directly arise, as the main ground of decision, but it was pressed in argument, which called forth the observations made by the Court.
It may safely be assumed as a fact, evidenced by the case of Cradock's Lessee v. Stalcup, that previously to the question being raised in the two cases of Weatherhead and Douglas v.
Bledsoe's Heirs, and Elliot's Heirs v. Lillard, that the opinion of the old District Court before its abolition, being then the court of ultimate resort, was opposed to the idea of a connected chain of title. See Term. 286, 351, 448.
It is these two cases of Elliott's Heirs v. Lillard, and Weatherhead and Douglas v. Bledsoe's Heirs, to which the S. C. U. S. refer as settling the construction of the Act of 1797. The first took place in August, 1815, and in this case the two judges composing the Court were divided; beside, it was then clearly understood to be the opinion of Cooke, J., that the possession must be connected by a chain of legal title, and not one that would be good inequity, as the opinion lately printed in a pamphlet form imports. The idea of a connection founded in law is necessarily implied, provided the legislature intended a connection at all, but not so of a connection in equity. The nature of limitation is purely legal, and the legislature cannot be presumed to have designed an equitable connection; it must be supplied by an equitable construction, or intendment, in the same manner as the idea of possession,
according to the opinion on the other side. The only question is, which intendment is nearest to the reason of the common law. See Bac. Ab. tit. Statute I. 4 I. 6. In reality, there was but one opinion instead of two, upon which the question of connection of title, either in law or equity, should rest. This was the case of Weatherhead and Douglass v. Bledsoe's Heirs, at Carthage, finally decided at December term, 1815.
That decision has been published; the Court, consisting of three judges, was full, and the opinions of the judges believed to be correctly stated. The result of the reasoning of each of the judges will appear by reference to the case. Overton, J., conceived that no connection, either in law or equity, was necessary. Roane, J., thought that such a connection as would satisfy a jury ought to be shown. Cooke, J., that a connection, good either in law or equity, must be proved, or the defendant could not avail himself of his possession. It is with this opinion of Judge Cooke that the Supreme Court of the United States concurs, and not with the opinions of either of the other judges.
So far as relates to a legal or equitable connection being requisite, the opinions of a majority of the Court stand opposed by what has been related to have taken place in the old district courts. Under these circumstances, it is manifest that the Supreme Court of the United States acted under a misapprehension when it considered the point as settled in the State of Tennessee.
It is an universally received rule of construction, that statutesin part materia, or on the same subject, are to be taken and considered together.
The several acts affording compensation for improvements, after eviction in due course of law, rest on the same ground as the fourth section of the Act of 1797, constituting the aforesaid explanatory act. The third section of this act, nor any of the acts respecting improvements, have been noticed, in the two cases alluded to, either in argument or from the bench.
The third section of the explanatory act (1797, c. 43) is employed in providing compensation for the improvements of possessors, who should be dispossessed in due course of law. The language used to designate such possessors as should be entitled to compensation for the value of their improvements is the same with that employed in the fourth section respecting the possessions held for seven years, being that part of the act under examination, and intended to bar all adverse claimants. The language used in the third section being the same as in the fourth, we are constrained to believe that the predicament of possessors should be the same in both cases, except merely length of time contemplated in the fourth section.
Dispossessed improvers are known to be the peculiar favorites of the legislature, as well as courts of equity. See various acts of Tennessee on the subject, and the case of Bristoe v. M'Campbell and Evans, ante, 341. There is difficulty in believing that the legislature designed by the third section of the act to provide for such improvers only as should be able to show a regular connection of paper title with the grant at any distance of time.
That there may be no doubt respecting the third section, which is explanatory of the fourth, its words are inserted, and are as follow: "That any grantee or other person claiming by deed of conveyance founded on a grant, hath by virtue thereof obtained peaceable possession of any tract of land, and shall at any time thereafter be dispossessed by due course of law, or otherwise put out of possession, without his, her, or their consent first had and obtained; then and in that case the person so dispossessed shall be entitled to recover at common law, from the person to whose use the dispossession was so made, the value of the improvements which he, she, or they may have made on the said land; provided he, she, or they do pay a reasonable rent for the said improvements, to be deducted out of the same."
The fourth section of the same act has been recited. Let them be compared, and then this question asked: Is it not probable that the legislature meant that the possession of a person entitled to compensation for improvements after eviction, before the expiration of seven years, should be precisely of the same nature that would give a person a complete right, or entitle him to bar all adverse claims after seven years? And that a bond fide possessor should not be barred from compensation for improvements, though he might not show a regular and connected chain of title, either in law or equity. Certain it is, that if the fourth section will not afford a bar, without connection of paper title, so the improver will not be entitled to compensation without showing a similar connection.
The Act of 1813, c. 22, respecting improvements, uses the same language with the third and fourth sections of the Act of 1797, and therefore tends to show the sense of the legislature of 1813 in relation to the color of title contemplated by the fourth section of the Act of 1797. The words of the Act of 1813 are "that hereafter, when an action of ejectment shall be brought in any of the courts of this State, when the tenant or defendant in possession shall have color oftitle to the premises in dispute, or any part thereof, either by grant, deed of conveyance founded upon a grant, or entry for the same, lying in any part of this State, or claim by occupancy and pre-emption in the country south of French Broad and Holston rivers," then to be allowed for improvements, c.
At the time of the passage of the act, the cases referred to had taken place in the old district courts which, at one period, at least, ascertained the sense of that court, that a connection of title was not necessary. The legislature is presumed to have known of these cases, and to have acquiesced in the interpretation given to the act by the courts, otherwise it would have expressed itself differently in the Act of 1813.1*
1* Cooke, 341 Acc. *Page 387 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 388 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 389 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 390 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 391 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 392 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 393 
[EDITORS' NOTE: THIS PAGE CONTAINED FOOTNOTES.] *Page 394